UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE  DIVISION

| | | |
|---|---|---|
| SHERYL DERRINGE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:04-cv-217-RLY-WGH |
| | ) | |
| OLD NATIONAL BANK, | ) | |
| Defendant. | ) | |

**ENTRY ON OLD NATIONAL BANK'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Sheryl Derringe, brings this cause of action against her former employer, defendant, Old National Bank ("ONB").  In her Complaint, Plaintiff alleges that ONB was discriminatory by fostering and failing to eradicate a hostile work environment on account of sex, by retaliating against Plaintiff for protesting what she alleged to be sex discrimination, and by discriminating against her on the basis of her sex.  ONB now moves for summary judgment.  For the reasons set forth below, the court **GRANTS** its motion.

**I.      Factual Background**

      **A.      Plaintiff's Employment Background at ONB**

1.      In March of 1994, ONB hired Plaintiff as a task force teller at the Hebron ONB branch.  (Deposition of Sheryl Derringe ("Plaintiff Dep.") at 58-59).

2.      In 1998, following two promotions in Credit Card Collections, Plaintiff began working in Consumer Collections as a Collector.  (Plaintiff Dep. at 60, 63).

3.     In May 2002, Plaintiff was promoted to Collection Supervisor by Don Adams
       ("Adams"), Manager of the Collections Department, and Chip Tate ("Tate"),
       ONB's Southern Region Credit Administrator.  (Plaintiff Dep. at 63).

4.     In May 2003, Adams resigned while under investigation for engaging in business
       practices that violated ONB policy.  (Deposition of Chip Tate ("Tate Dep.") at 7).

5.     On the same day that Adams resigned, Tate met with Plaintiff to discuss whether
       she would take over as acting manager upon Adams' departure.  (Tate Dep. at 22-
       23).  Tate informed Plaintiff that this was an opportunity for her to show
       management her abilities and performance as the bank was trying to determine
       how the collection area would be consolidated.  (Tate Dep. at 23).

6.     Plaintiff accepted the offer and assumed the job responsibilities as the acting
       Collection Manager.  (Plaintiff Dep. at 91).

7.     As acting Collections Manager, Plaintiff was under Tate's supervision.  (Tate Dep.
       at 26).

8.     In June 2003, Tate informed Plaintiff that ONB had made a decision that it was not
       going to hire or replace the Collection Manager position.  (Plaintiff Dep. at 90-91).

9.     In July 2003, Jane Wittmer-Kuhn ("Wittmer-Kuhn") was ONB's Human
       Resources Director of the Bank's Southern Region, which includes Tennessee,
       Kentucky, and Southern Indiana.  (Deposition of Jane Wittmer-Kuhn ("Wittmer-
       Kuhn Dep." at 20).

**B.     The Anonymous Document**

10.    In early July 2003, Bert Brown ("Brown"), Wittmer-Kuhn's assistant, received an

anonymous document from employees in the Collection Department.  The

document alleges that Plaintiff was engaging in misconduct as acting Collections

Manager.  Brown forwarded the document to Wittmer-Kuhn.  (Wittmer-Kuhn

Dep. at 20; Affidavit of Jane Wittmer-Kuhn ("Wittmer-Kuhn Aff.") ¶ 11 and Ex. E

attached thereto).

11.    As the Human Resources Director, Wittmer-Kuhn had the duty and responsibility

to investigate the allegations.  (Wittmer-Kuhn Dep. at 25 and Wittmer-Kuhn Aff. ¶

10).

12.    The anonymous document alleges that Plaintiff is often unavailable to assist or

answer questions for employees and customers, and that Plaintiff's manner of

reprimanding an employee includes screaming and cursing.  (Wittmer-Kuhn Aff.,

Ex. E at 1).

13.    The anonymous document further alleges specific conflicts of interest concerns

with respect to Plaintiff's use of the repossession company, Mayhugh Services,

including pulling credit reports on customers of other banks for Mayhugh Services.

It also alleges a scheme where Plaintiff manipulated documents for repossession

fees with an employee of Mayhugh Services.  The anonymous allegations further

charge that increased repossession fees were being incurred by ONB which

Plaintiff may have profited from personally.  The anonymous document also raises

allegations that Plaintiff was using vehicles that ONB had repossessed for personal use, while drinking and driving recklessly.  (Wittmer-Kuhn Aff., Ex. E at 1-2).

14. Mayhugh Services is a third-party vendor ONB uses to repossess automobiles which serve as collateral for ONB automobile, consumer loans.

### C.     The July 10, 2003 Meeting

15. On July 10, 2003, Wittmer-Kuhn and Tate asked Plaintiff to meet with them in Wittmer-Kuhn's office to discuss the allegations contained in the anonymous document.  (Plaintiff Dep. at 92).

16. Wittmer-Kuhn advised Plaintiff that she had received complaints from employees in the Collections Department.  (Plaintiff Dep. at 93).

17. Tate asked Plaintiff whether she knew if Adams had any ownership interests in Mayhugh Services.  (Plaintiff Dep. at 93).

18. Wittmer-Kuhn then asked Plaintiff about each allegation contained in the anonymous document, including allegations regarding Plaintiff's leadership ability and whether she screams or addresses co-workers inappropriately with a raised voice or offensive language.  (Wittmer-Kuhn Dep. at 11).

19. Wittmer-Kuhn reviewed the allegation that Plaintiff had driven a repossessed ONB vehicle recklessly and while she was intoxicated.  (Plaintiff Dep. at 96).

20. Wittmer-Kuhn also reviewed the allegation that Plaintiff was giving ONB business to Mayhugh Services in exchange for personal profit.  (Plaintiff Dep. at 93).

21. Plaintiff denied all of the allegations in the anonymous document.  (Plaintiff Dep.

4

at 93-97).

22.    Wittmer-Kuhn also asked Plaintiff if she had a sexual relationship with Jerry Pratt ("Pratt"), part-owner of Mayhugh Services.  Plaintiff denied having a sexual relationship with Pratt, but admitted that they were friends.  (Plaintiff Dep. at 93-94, 124).

23.    At the conclusion of the meeting, Wittmer-Kuhn told Plaintiff that ONB wanted her to take the next day off (July 11th) with pay while Human Resources interviewed all of the employees in the Collections Department.  (Plaintiff Dep. at 98).

24.    Plaintiff requested to be at work on July 11th because she wanted to be present during the investigation.  ONB agreed to her request.  (Plaintiff Dep. at 98).

**D.    The July 11, 2003 Employee Interviews**

25.    On July 11, 2003, Wittmer-Kuhn interviewed all of the employees from the Collections Department individually in her office.  (Plaintiff Dep. at 99).

26.    The initial investigation produced facts regarding poor leadership in that Plaintiff inappropriately corrected employees by raising her voice and using profanity. (Tate Dep. at 30-31).

27.    The initial investigation also revealed allegations of missing car titles, cars and campers, and questions regarding personal use of cashiers checks and gas credit cards.  The investigation also raised questions about a potential scheme and conflict of interest between Plaintiff and Mayhugh Services.  (Wittmer-Kuhn Dep.

5

at 6-7; Wittmer-Kuhn Aff., Ex. E).

### E.     Plaintiff is Suspended

28.    Because of these issues, Wittmer-Kuhn needed to continue the investigation

through ONB's Audit Department to retrieve and review various documents and

files within the Collections Department computer system.  (Wittmer-Kuhn Dep. at

6-8).

29.    At the conclusion of the interviews, Wittmer-Kuhn informed Plaintiff that the

investigation was still ongoing and that she was suspended until completion of the

investigation.  (Plaintiff Dep. at 104; Wittmer-Kuhn Dep. at 6).

30.    Wittmer-Kuhn also advised Plaintiff that ONB would not permit her to return to

the bank as a Collections Supervisor.  (Plaintiff Dep. at 121).

### F.     Missing Computer Files and Plaintiff's Termination

31.    When the Collections Department started to prepare its regular monthly report for

July, it did not have all of the necessary information to do so.  (Wittmer-Kuhn

Dep. at 11).

32.    The Collections Department therefore asked Wittmer-Kuhn if she could find it on

Plaintiff's computer system.  (Wittmer-Kuhn Dep. at 10).

33.    When Wittmer-Kuhn tried to find the information on Plaintiff's computer system,

she discovered that all of the files had been deleted, including a repossession

management report and information about cars that were sold to Mayhugh

Services.  (Wittmer-Kuhn Dep. at 9, 11; Wittmer-Kuhn Aff. ¶ 13).

34.     The Audit Department also discovered that files on associate's incentive plans had been deleted from Plaintiff's computer.  (Wittmer-Kuhn Dep. at 9-10).

35.     In order to obtain the information needed by the Collections Department, ONB had to re-create the deleted files by using its off-site backup software system.  (Wittmer-Kuhn Dep. at 11).

36.     ONB has a detailed "Computer Use Policy" in its Associate Handbook.  (Wittmer-Kuhn Aff. ¶ 8 and Ex. C attached thereto).

37.     Pursuant to the Computer Use Policy, it is a violation of work rules and policies to participate in any conduct which interferes with the normal and proper operation of the bank's computing activities.  (Wittmer-Kuhn Aff. ¶¶ 4, 6 and Ex. A attached thereto).

38.     The Computer Use Policy specifically prohibits employees from intentionally damaging the system and intentionally misusing system resources.  In addition, the Computer Use Policy specifically prohibits employees from tampering with terminals and other associated equipment.  (Wittmer-Kuhn Aff. ¶¶ 4, 6).

39.     Pursuant to the Computer Use Policy, employees who abuse or violate the computing activities at ONB are subject to disciplinary action up to and including discharge.  (Wittmer-Kuhn Aff. ¶ 5 and Ex. A attached thereto).

40.     On August 7, 2003, Wittmer-Kuhn mailed a letter to Plaintiff which stated that she was terminated because of her intentional deletion of reports and collections of information that are vital to the Company, and all of which is covered by the ONB

7

Employee Handbook, is a violation of Company policy and grounds for termination.  (Wittmer-Kuhn Aff. ¶ 14 and Ex. F attached thereto).

### G.    ONB Fills the Collection Manager Position

41.    After Plaintiff's termination, ONB appointed Charlie Goebel ("Goebel") to the Collections Manager position.  (Tate Dep. at 20-21).

42.    Tate testified that at the time Goebel was appointed as Manager of the Collections Department, "we were still considering our consolidation process, so there was no title given at that point in time for the position."  (Tate Dep. at 20-21).

43.    Goebel had prior management experience at ONB in Mortgage Collection as well as prior experience in Credit Card Collection and Special Asset Collection.  (Tate Dep. at 22).

44.    After Goebel's appointment to Collections Manager, ONB centralized its Collections Departments for the entire company, and Goebel was removed from the Collections Manager position to a position in ONB's Special Asset Group. (Tate Dep. at 20).

### H.    Sexual Harassment Policy

45.    ONB's Associate Handbook contains a policy which prohibits sexual or other unlawful harassment.  (Wittmer-Kuhn Aff. ¶ 7 and Ex. B attached thereto).

46.    The policy provides a complaint procedure for all employees to use, including who the employee should contact to make a complaint about sexual or unlawful harassment.  (Wittmer-Kuhn Aff. ¶ 7 and Ex. B attached thereto).

47.     Plaintiff has acknowledged receiving the handbook.  (Wittmer-Kuhn Aff. ¶ 8).

**I.      Plaintiff's Allegations of Sexual Harassment**

48.     Plaintiff alleges that her employees would often gossip about her.  This office
        gossip included allegations that she engaged in sexual relationships with Adams
        and Pratt.  (Plaintiff Dep. at 73-74, 76).

49.     Plaintiff testified that the alleged office gossip was "a release . . . and that's why I
        just turned a deaf ear on a lot of it.  The gossip, I considered the source, and that's
        why I never went anywhere higher with that" – i.e., why she never reported the
        alleged office gossip to ONB management or Human Resources.  (Plaintiff Dep. at
        188-99).

50.     The only complaint about employee conduct that Plaintiff made was to Brown
        about an incident involving Brian Jones.  (Plaintiff Dep. at 114).

51.     This incident started when Plaintiff counseled Jones about trying to repossess a
        vehicle by going outside of proper channels.  (Plaintiff Dep. at 115-16).

52.     After Plaintiff walked away, Jones allegedly said, "She doesn't want to f - - - with
        me because I will f - - - her up."  (Plaintiff Dep. at 116).

53.     Brown offered to assist Plaintiff in dealing with Jones.  Plaintiff declined his offer.
        (Plaintiff Dep. at 117).

54.     Plaintiff alleges that the Collections Department employees were jealous of her.
        She testified that when she was hired as supervisor to assist Adams, her co-
        workers in the department did not like the fact that they could "no longer go to a

doctor's appointment with pink fingernails and come back with red fingernails and get away with it anymore."  (Plaintiff Dep. at 76).

55.     Plaintiff also alleges that Tom Riddle ("Riddle"), a Collections Department employee, came to her office with fists balled up and said that Plaintiff was sitting in his chair.  Apparently, Riddle had applied for the supervisor's job and didn't get it.  (Plaintiff Dep. at 119).

## II.     Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   A fact is "material" if it is outcome determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "genuine" where the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *National Soffit & Escutcheons, Inc. v. Superior Systems, Inc.*, 98 F.3d 262, 264 (7th Cir. 1996).  While the moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986),  the non-moving party may not simply rest on the pleadings, but "must affirmatively demonstrate by specific factual allegations that a

genuine issue of material fact exists for trial." *Id.*  If the non-moving party fails to make a

sufficient showing on an issue for which he has the burden of proof, the moving party is

entitled to judgment as a matter of law.  *Ripberger v. Western Ohio Pizza, Inc.*, 908

F.Supp. 614, 617 (S.D. Ind. 1995) (*citing Celotex Corp.,* 477 U.S. at 323)).  "If, however,

doubts remain as to the existence of a material fact, then those doubts should be resolved

in favor of the non-moving party and summary judgment denied." *Wolf v. City of

Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

**III.    Discussion**

**A.    Hostile Work Environment**

In order to establish a hostile work environment on the basis of sex, a plaintiff

must show that: (1) she was subjected to unwelcome harassment in the form of verbal or

physical conduct of a sexual nature; (2) the harassment was based on the plaintiff's sex;

(3) the harassment was severe and pervasive so as to alter the conditions of the

employee's environment and create a hostile or abusive working environment; and (4)

there is a basis for employer liability.  *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th

Cir. 2002) (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir.

1998)).

As the Seventh Circuit has noted, in order for a plaintiff to show a hostile work

environment, the alleged harassment must be both subjectively and objectively hostile.

*Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (internal quotation omitted).

Moreover, "[i]n determining whether the environment was objectively hostile, the court

must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with the employee's  work." *Id.*  "Indeed, the threshold for plaintiffs is high, as the workplace that is actionable is one that is hellish." *Id*.  Whether such an environment exists is a question of law.  *Hardin v. S. C. Johnson & Son, Inc*., 167 F.3d 340, 345 (7th Cir. 1999).

### 1.    Plaintiff's Work Environment Was Not Objectively Hostile or Abusive

Evidence of office gossip amongst one's co-workers, in and of itself, is insufficient to establish a hostile work environment claim against one's employer.  *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 549 (7th Cir. 1997) ("Mere office gossip and banter falls far short of establishing that [an employer] either condoned or licensed sexual harassment, nor would unsubstantiated rumors permit a reasonable person to conclude that such harassment was part of the 'ordinary course of business' [in the workplace].").

Plaintiff attempts to create an issue of fact by arguing that ONB made unfounded accusations against her during the July 10th meeting, likening her to a "whore, a siren . . . sleeping her way to the top."

The evidence reflects that during the July 10th meeting, Wittmer-Kuhn asked Plaintiff whether she was involved in a sexual relationship with Pratt.  Plaintiff responded that they were only friends.  No reasonable juror would find that question to be tantamount to accusing Plaintiff of being a "whore" and the like, particularly since

12

Wittmer-Kuhn had a legitimate business reason to ask Plaintiff that question – i.e., a conflict of interest with Mayhugh Services.

For these reasons, the court finds that Plaintiff's work environment was neither objectively hostile nor abusive.

### 2.    There Is No Basis for Employer Liability

Because Plaintiff's alleged harassers are her co-workers, ONB is only liable under a negligence standard.  Under this standard, a plaintiff must show that her employer was either negligent in not discovering the harassment or in not remedying the harassment. *Parkins*, 163 F.3d at 1032.  Recognizing that it "would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee," "notice or knowledge of the harassment is a prerequisite for liability." *Id*. at 1035 (citations omitted).

In determining whether an employer had notice of harassment, the court must first determine whether the employer has designated a channel for complaints of harassment. *Id*.  An employer is deemed to have complied with this requirement where the employer can receive notice of harassment from a "department head" or someone that "the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment." *Id*. (quoting *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997).  Thus, a plaintiff cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think with some probability that she was being sexually harassed." *Id*. (quoting

*Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996)).

ONB has a sexual harassment policy contained within its Associate Handbook which discusses the appropriate channels one should take if one believes he or she is the victim of sexual harassment within the workplace.  Specifically, one should report such inappropriate conduct to one's supervisor, Human Resources Representative, the Director of Human Resources, or the Director of Employee Relations.  Plaintiff has acknowledged receiving the handbook.

Despite the handbook, Plaintiff acknowledges that she did not complain to anyone in management or to the Human Resources department about the alleged actions of her co-workers which allegedly created a hostile work environment based on sex.

The only complaint Plaintiff made to Human Resources involved employee Jones.  That complaint, however, was over Jones' failure to follow proper procedure with regard to a repossessed vehicle.  (*See* Findings of Fact ## 50-53).  It had nothing to do with Plaintiff's sex, nor sex in general.

Because Plaintiff fails to establish the third and fourth elements of her hostile work environment claim, Plaintiff's hostile work environment claim cannot survive summary judgment.

**B.     Retaliation**

Plaintiff brings two claims for retaliation: one in relation to her suspension and the other in relation to her discharge.  In order for a plaintiff to establish a prima facie case of retaliation, a plaintiff is required to show that: (1) she engaged in statutorily protected

activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Wells v. UniSource Worldwide Inc.*, 289 F.3d 1001, 1008 (7th Cir. 2002).

### 1.    Suspension

Plaintiff contends that Wittmer-Kuhn and Tate retaliated against her on July 10th and 11th by suspending her following her "protests" of alleged discrimination, namely employee gossip.  Plaintiff testified:

> Q:    Okay.  You also allege that Old National retaliated against you for protesting what you sincerely believe to be discrimination in the presence of a sexually hostile environment.
>
> Who retaliated against you?
>
> A:    Chip Tate and Jane Wittmer.
>
> Q:    Are you saying they retaliated against you because you protested anything?
>
> A:    I protested that day.
>
> Q:    That day meaning July the 10th?
>
> A:    And 11th. . .
>
> Q:    And you protested what?
>
> A:    Like I said, I gave him credit for more sense than that, than to believe that gossip.

(Plaintiff Dep. at 110-11).

As noted above, Plaintiff must first establish that she engaged in statutorily protected activity.  "Statutorily protected activity" includes the filing or participation in

the filing of a charge or voicing one's opposition to "any practice made an unlawful employment practice . . ." *See, e.g., Speedy v. Rexnord Corp.*, 243 F.3d 397, 404 n. 4 (7th Cir. 2001) (citing 42 U.S.C. § 2000e-3).

Plaintiff's denials of the questions posed by Wittmer-Kuhn and Tate on July 10th and 11th are not complaints of statutorily protected activity which would place ONB Human Resources or ONB management on notice that Plaintiff had been subjected to an unlawful employment practice – i.e., a hostile work environment.  In fact, by Plaintiff's own admission, Plaintiff never made a complaint to Human Resources or any other management official about the co-employee gossip as she "considered the source" and "turned a deaf ear" to such gossip.  Because Plaintiff cannot establish the first element of her prima facie case, Plaintiff's retaliation claim fails as a matter of law.

### 2. Discharge

In Plaintiff's Response, Plaintiff argues that she was discharged in retaliation for her protests of discrimination.  This claim is without merit because (1) she did not engage in statutorily protected conduct as noted above; and (2) there is no evidence of pretext, as noted in Section III.C.3 of this opinion.

### C. Sex Discrimination

In order to establish a prima facie case of sex discrimination for failure to promote, a plaintiff must show that: (1) she belonged to a protected group; (2) she applied for and was qualified for a promotion; (3) she was rejected for the promotion; and (4) the person promoted had similar or fewer qualifications for the job. *Grayson v. City of Chicago*, 317

F.3d 745, 748 (7th Cir. 2003); *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 764-65 (7th Cir. 2001).

Plaintiff's Response also claims sex discrimination with regard to her demotion, suspension, and termination.  In order to establish her prima facie case in each context, she must show (1) she belonged to a protected group; (2) she was performing her job to her employer's legitimate expectations; (3) she was demoted, suspended, or terminated; and (4) employees not in the protected class were treated more favorably.  *See, e.g., Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1404 (7th Cir. 1996).

In both instances, if the plaintiff succeeds in making out her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for failing to promote the plaintiff.  *Leffel v. Valley Financial Serv.*, 113 F.3d 787, 792 (7th Cir. 1997).  If the defendant does so, the burden then shifts to the plaintiff to establish that the defendant's reasons are a pretext for discrimination.  *Id.*

### 1.  Failure to Promote

In May of 2003, following Adams' resignation, Tate appointed Plaintiff to the position of acting Collections Manager until "the bank 'decided' what to do about filling Adams' job."  Charge of Discrimination at 2 ¶ A.  Plaintiff did not apply for this position.  Nor was Plaintiff rejected from this position.  Ergo, Plaintiff's sex discrimination claim based on a failure to promote fails as a matter of law.

17

## 2.      Demotion and Suspension

In her Response, Plaintiff fails to identify a male employee who engaged in similar conduct and was treated more favorably than she – i.e., not suspended, demoted, or terminated for the same or substantially similar conduct.  This alone dooms her claims.

In addition, Plaintiff fails to establish that ONB's reasons for suspending or demoting her were a pretext for discrimination.  The evidence reflects that Wittmer-Kuhn and Tate were given an anonymous document from ONB employees in the Collections Department which alleged that Plaintiff had poor leadership abilities and engaged in questionable business practices.  Wittmer-Kuhn, as the Human Resources Director, had a duty and responsibility to investigate the allegations.  Following the interview with Plaintiff on July 10th and the interviews with the Collections Department employees the following day, Wittmer-Kuhn and Tate suspended Plaintiff pending further investigation, and advised Plaintiff that she would not return as acting Collections Supervisor.  Thus, Plaintiff's suspension and demotion had nothing to do with her sex.  Plaintiff's sex discrimination claims based on her demotion and suspension therefore fail as a matter of law.

## 3.      Discriminatory Discharge

Again, Plaintiff fails to identify a male employee who engaged in similar conduct and was treated more favorably than she.

Moreover, Plaintiff fails to establish pretext.  It is undisputed that during Wittmer-Kuhn's investigation into the anonymous employee complaints, she discovered that

18

Plaintiff deleted all of her computer files from her computer, including repossession management reports that go up to management, files about cars that were sold to Mayhugh Recovery, and files on the associate's incentive plan.

Plaintiff admits that she deleted ONB documents and reports from the computer files on the P-drive of her computer.  Plaintiff, however, tries to justify her conduct by claiming that the files she deleted were only templates and available to other employees in the department:

> A:    Those were not normal course of – that was not normal course of business.  Those were templates.

(Plaintiff Dep. at 138).  When asked what she was referring to by templates:

> A:    Templates.  Every letter on there that was a collection letter the collectors had in their computers.
>
> Every report Rhonda Chandley and Darla Hicks had.  This was all on my P drive.  I did not delete anything out of the O drive . . .

(Plaintiff Dep. at 138).

Plaintiff's conclusory statements of what was or was not on other Collection Department employee computers does not justify deleting these documents, and these statements do not offer any evidence that she had any authority to determine that these documents could be deleted.

In short, the deletion of ONB's documents and reports was misconduct that violated ONB's Computer Use Policy and is grounds for termination.  Plaintiff fails to offer evidence which calls ONB's decision to terminate her into question.  *See Dvorak v.*

*Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 488-89 (7th Cir. 2002) (holding that an employer's sincere belief that an employee had misused his computer along with expressing dissatisfaction with the employee's work constituted a non-discriminatory reason for discharge whether or not the employer was ultimately wrong or unfair in its determination).  Plaintiff's discriminatory discharge claim therefore fails as a matter of law.

**IV.     Conclusion**

Plaintiff's Title VII claims for discrimination and retaliation are not supported by the evidence.  Accordingly, Defendant's Motion for Summary Judgment must be **GRANTED**.

**SO ORDERED** this <u>27th</u> day of October 2006.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Kevin Scott Kinkade
O'LEARY AND ASSOCIATES
oleary@gibsoncounty.net

20

Virginia M. O'Leary
O'LEARY & ASSOCIATES
oleary@gibsoncounty.net

Arthur D. Rutkowski
BOWERS HARRISON, LLP
adr@bowersharrison.com

Holly Ziemer
OLD NATIONAL BANCORP
holly_ziemer@oldnational.com